

DEC **16** 2020

Clerk, U.S. District Court
Texas Eastern

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION



UNITED STATES OF AMERICA § **SEALED**
§
v. § No. 4:20-CR-212
§ Judge Mazzant
§
KAYLEIGH MOFFETT (2) §
§
§
§
§
§
§
§

## **SECOND SUPERSEDING INDICTMENT**

THE UNITED STATES GRAND JURY CHARGES:

At all times material to this Second Superseding Indictment:

## **INTRODUCTION**

1.                                                      registered thousands of aircraft in

Onalaska Texas, an East Texas town without an airport. The true owners of many of

these aircraft are foreign nationals. Non-citizens can register aircraft with the United

States Federal Aviation Administration if the aircraft is placed in a trust managed by a

United States trustee. 14 C.F.R. § 47.7(c). In exchange for entering into this

arrangement, the foreign national receives a coveted "N" tail number for his aircraft.

This "N" number is valuable because foreign countries are less likely to inspect an U.S.-

registered aircraft for airworthiness or force down an American aircraft. It also avoids

foreign taxes related to the aircraft's importation to that foreign country and increases the aircraft's resell value.

2.      To register an aircraft held in a U.S. Trust, the U.S. Trustee submits at least three documents for FAA review: (1) the Trust Agreement; (2) an Affidavit of Citizenship of the Owner Trustee; and (3) the Operating Agreement or Lease Agreement. The FAA then issues a reasoned opinion about whether the aircraft is eligible for registration. ███ followed this procedure, but made several fraudulent representations or filings in the process. It then received an opinion letter from the FAA stating, "we have reviewed both the Trust Agreement and the Affidavit for compliance with 14 C.F.R. § 47.7(c). "Regarding the Trust Agreement, . . . Article 6.2(c) directs the owner trustee to effect registration of the aircraft with the FAA." Article 6.2 of ███'s standard Trust Agreement outlines the actions the Trustee "covenants and agrees to take." Article 6.2(c) requires the Trustee to "take all actions which the Trustee deems necessary or advisable to register any Aircraft which comprises a portion of the Trust Property with the United States Federal Aviation Administration and to insure that the Aircraft maintains its registration and *complies with related regulations and requirements*." (emphasis added). After reading this provision, and others, the FAA concluded that "the form of the Trust Agreement … satisfies the requirements of Sections 47.7(c)(2)(i) and 47.7(c)(2)(iii)." It determined the aircraft was "eligible for United States registration in the name of the Owner Trustee."   Without this representation, the FAA would not register the aircraft.

3.      Upon entering this arrangement, the trustee is responsible for complying with aircraft reporting obligations, which they cannot delegate to third parties. In June

Second Superseding Indictment – Page 2

2013, the FAA stressed, "The regulatory obligations of an owner trustee with regard to an aircraft registered in the U.S. using a non-citizen trust are, and always have been, the same as the regulatory obligations of all owners of U.S. registered aircraft." Fed. Reg. Vol 78, No. 117 (June 18, 2013). "The FAA Registry is an 'owner' registry; it is not an 'operator' registry." *Id.* "Once the FAA completes the registration process, the registered owner is the owner for all purposes under the regulations." *Id.* "The FAA has determined that there is nothing inherent in the status of a trustee owner of a U.S.-registered aircraft that would affect or limit its responsibilities for ensuring compliance with applicable laws and regulations." *Id.* Thus, "an owner of an aircraft on the U.S. registry cannot avoid a regulatory obligation imposed on it by the FAA simply by entering into a private contract with another party." *Id.*

4.    The aircraft is subject to United States regulations and requirements, including those issued by the Department of Commerce. The Owner Trustee promised the FAA compliance. If the aircraft is exported, then the Trustee must insure the required Electronic Export Information is filed under 15 C.F.R. §§ 30.3, 758.1(b)(5), and 758.2. ███ refused to comply, even when confronted by United States authorities.

5.    The defendants circumvent United States laws and regulations by placing "N" numbers in the hands of drug traffickers and prohibited foreign nationals. Each named individual participated in the scheme. The defendants use their status as United States citizens with United States corporations to execute a three-part scheme furthering international drug trafficking activity. *First*, the defendants violate FAA and Department of Commerce regulations to register aircraft with the United States while concealing the

Second Superseding Indictment – Page 3

aircraft's true ownership and exportation. *Second*, when law enforcement seizes a registered aircraft laden with drugs, the defendants deregister or otherwise transfer ownership of the aircraft. *Finally*, the defendants participated in a series of bogus aircraft sales transactions in order to conceal the movement of illegally obtained funds.

## **THE DEFENDANTS AND THEIR CORPORATE ENTITIES**

6.    ███████████████████████ was founded in Onalaska, Texas, Eastern District of Texas. In December 2014, ████████████ purchased ████ and continued registering aircraft in Onalaska, Texas. On or about January 22, 2020, ████ changed its address to 928 SW 107th St. Oklahoma City, Oklahoma 73170.

7.    ███████████████████████ is an Oklahoma corporation with a principle place of business in Oklahoma at 928 SW 107th Street, Oklahoma City, Oklahoma 73170. WBAT often acts as an escrow agent in aircraft purchase transactions involving ████ and other co-conspirators. ████ shares resources, office space, and employees with ████. At times, it makes FAA filings related to ████ aircraft.

8.    █████████████████ is listed on ████'s website as its Mexican-based location.

9.    ███████████████ owns ████ and ████.

10.    **Kayleigh Moffett** is an officer of ████████████.

11. ███████████████ owns and operates ██████████. ████████ ██████████████████████████ are listed on ████'s website as its representatives in Mexico.

12. ███████████████ is a Florida corporation, with its principal place of business located at ███████████████████████████████ ████. ██ acts as a broker for third-party buyers of aircraft.

13. ███████████████ is a Florida corporation, with its principal place of business located at ███████████████████████████ ██████████ acts as a broker for third-party buyers of aircraft.

14. ███████████ owns and operates █████████.

15. █████████, is a Wyoming company, with a principle place of business at ████████████████████████.

16. ████████████████ is a Wyoming corporation, with its principle place of business at ████████████████████.

17. ███████████████ is a Wyoming corporation, with its principle place of business at █████████████████████.

18. ████████████ purchases aircraft and illegally exports them to foreign countries using Texton, TWA, and Ford Electric Co.

19. ████████████████ is a Costa Rican national and pilot.

20. ███████████ is a Mexican national and pilot.

21. ████████ is a Texas corporation with its principle place of business at █████████████████████████.

22.   ▮▮▮▮▮ is a Delaware limited liability corporation with its principle place of business at ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

23.   ▮▮▮▮▮▮ is a Delaware limited liability corporation with its principle place of business at ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

24.   ▮▮▮▮▮▮▮ is the Managing Member of ▮▮▮▮ and the ▮▮▮▮▮▮▮ He also owns ▮▮▮▮

25.   The above-mentioned companies are interrelated. For example, ▮▮▮▮ is the Mexican representative of ▮▮▮▮▮▮ comingle leadership, employees, resources, and office space. ▮▮▮▮▮ have similarly comingled their operations. ▮▮▮▮▮ contract with ▮▮▮ as an escrow agent and ▮▮▮ transacts business with ▮▮▮. In November 2018, WBAT received three wires comprising $220,000 from ▮▮▮ for the purchase of an aircraft. ▮▮▮ was also involved in the purchase of aircraft used by ▮▮▮.

## OFFENDING AIRCRAFT TRANSACTIONS

26.   The Department of Commerce (DOC), Bureau of Industry and Security (BIS), Office of Export Enforcement (OEE), and Homeland Security Investigation (HSI) initiated their investigation of Defendants after noticing irregularities in aircraft filings and learning that several defendant-registered aircraft were seized or destroyed while smuggling drugs internationally. The following paragraphs provide non-exhaustive examples by aircraft.

27.   **N8286M / N456PF**. On or about February 11, 2020, N8286M and N456PF were registered with the ▮▮▮ to ▮▮▮▮▮▮, an illegal alien with an

apartment in San Jose, California. In the registration documents, Lozano claimed to be a

U.S. Citizen (in violation of 49 U.S.C. § 46306 and 18 U.S.C. § 1001). That same day,

Declarations of International Operation were filed for both "N" numbers listing

Guadalajara, Mexico as the final destination. The associated bills of sale for this aircraft

were dated December 10, 2019 for N8286M and December 27, 2019 for N456PF.  These

transactions were brokered by ███████████████ ███████████. Because ███████ is

an illegal alien, he cannot legally register an aircraft as an individual with the United

States. DOC notified ███████ that his aircraft had been seized. ███████ signed a notice of

abandonment for the aircraft and stated that he believed his identity had been stolen.

     28.   **N260RC**. On or about January 31, 2020, N260RC was scheduled to depart

Brownsville, Texas to Monterrey, Mexico. 19 C.F.R. 122.22(c) requires private aircraft

pilots or their designees departing the U.S. to provide CBP Automated Passenger

Information System filings for each passenger at least one hour before departure. This

information was not provided, and the aircraft was seized. Agents reviewed the

ownership documents for the aircraft and determined that on September 15, 2017, the

Mescalero Apache Tribe sold this aircraft to ITRC, LLC. On or about October 20, 2017,

███████████ entered into a Trust Agreement for this aircraft. ███████████████

███████████—a foreign national—was the manager of ███████., a Mexican

corporation, held 100% of the membership shares of ███████████████ was the

president, CEO, and 99% shareholder of █████. A bill of sale showed transfer of this

aircraft to █████ and a corresponding Lease Agreement dated October 20, 2017, leased

the aircraft to ███████████████████████ signed the Lease Agreement

as the "Sole-Administrator." ▮▮▮ is a Texas corporation and the sales records show an address for ▮▮▮ of POB 2547 Onalaska, Texas, which subjects its purchase to Texas's 6.25% sales tax. Rather than pay this tax, ▮▮▮ filed a Texas Aircraft Exemption Certificate on or about October 30, 2017, stating that ▮▮▮ did not owe the tax because "the aircraft will be registered in Onalaska, Texas" but will "be hangered in Apodaca, NL, Mexico and is not purchased for use in Texas." The aircraft has been outside of the United States for three years without any export filings.

29. ***N18BA.*** On or about September 15, 2014, ▮▮▮▮▮▮▮▮ signed a bill of sale for N18BA to ▮▮▮. That same day, ▮▮▮ registered the aircraft with the FAA. On or about July 24, 2014, ▮▮▮ executed an Amended Dry Lease Agreement leasing the aircraft to ▮▮▮ On or about January 13, 2016, ▮▮▮ filed for a duplicate certificate with the FAA. On or about March 10, 2019, N18BA crashed in Mexico killing one pilot. Mexican authorities seized 1,215 kilograms of cocaine from the aircraft. Approximately five years earlier, in 2014, ▮▮▮▮▮ (who died in 2019 of natural causes) placed this aircraft in a trust controlled by ▮▮▮. ▮▮▮ continued to file registration documents for this aircraft under the leadership of ▮▮▮▮▮ and Kayleigh Moffett. On or about March 21, 2019, ▮▮▮ employee ▮▮▮▮▮, the Executive Vice President of Trust Administration, wrote the lessee of N18BA, ▮▮▮ ▮▮▮▮.

> We have received reports that N18BA was involved in a fatal accident in Mexico, March 10th. Please confirm if this is accurate, and if not, where is N18BA currently located? This is an urgent request, we are being asked by a US government entity to provide the current location of your aircraft, British Aerospace HS 125-700A, s/n NA0316, N18BA.

Mr. ▮▮ responded, "This information is false. The aircraft is currently located in Toluca airport in hangar 6A. It is currently in maintenance and therefore grounded." Continuing its investigation, the Department of Commerce served a subpoena on ▮▮▮▮▮▮ provided a written response, which claimed that the crashed aircraft falsely displayed the N18BA tail number, which belongs to a different ▮▮▮ aircraft. "The aircraft which crashed, Beechcraft 256046, was formerly registered in the U.S. under N299GS and was held by ▮▮ in 'Trust 1936' from October 3, 2011 to May 29, 2014." The beneficiary of the trust was Administración Aeronáutica International S.A. de C.V. and ▮▮▮▮▮▮▮ ▮▮▮▮▮▮ was the manager of that company. According to ▮▮, the aircraft was transferred to the foreign beneficiary before the crash on or about March 29, 2015, and the FAA Registration for this aircraft was canceled on or about February 15, 2018. ▮▮▮ and its co-conspirators did not make any export filings for this transaction. On or about January 22, 2020, Kayleigh Moffett filed an address update with the FAA for N18BA.

30.    *N305AG.* On or about October 5, 2012, N305AG was registered to ▮▮. That same day, a Declaration of International Operation was filed by ▮▮ for this aircraft. On or about September 11, 2018, Kayleigh Moffett filed a FAA Registration renewal. On or about January 27, 2020, N305AG was seized in Guatemala with approximately 1,700 kilograms of cocaine. The aircraft was taken into Guatemalan custody, where it has remained ever since. On or about January 29, 2020, news reports published the seizure. Two days later, on or about January 31, 2020, Kayleigh Moffett transferred ownership of the aircraft to Arrendadora THH SA de CV, a foreign company.

███ and its co-conspirators did not make any export filings for this transaction. On or about February 6, 2020, an open source video of N305AG flying out of the Guatemalan jungle went viral. On or about February 20, 2020, Moffett filed a bill of sale with the FAA and asked to deregister the aircraft.

31.    *N311BD.* On or about December 16, 2019, Kayleigh Moffett filed a bill of sale for N311BD, which transferred the aircraft from Gastelum—a convicted drug trafficker located in Sinaloa, Mexico[1]—to ███. That same day, Kayleigh Moffett filed for a Declaration of International Operation to Mexico on behalf of N311BD as trustee. On or about February 27, 2020, the aircraft was seized in Belize with approximately 2,310 kilograms of cocaine. The aircraft was taken into government custody, where it remains. The news broadcasted this seizure on or about March 1, 2020. Approximately four days later, ███████ sent Gastelum a letter stating that ███ will begin the reassignment and deregistration of N311BD. On or about April 14, 2020, Kayleigh Moffett filed a bill of sale transferring the aircraft to Gastelum despite the fact that the aircraft was in government custody in Belize. AGC and its co-conspirators did not make any export filings. In July 2020, the FAA advised Gastelum that he does not meet the U.S. citizenship requirements to register an aircraft.

32.    **N569LM.** On or about May 16, 2016, ███ entered into a trust agreement with Ancheta SA. de C.V. for the purposes of holding N56LM in a trust. It then leased the aircraft back to Ancehta, SA. de CV. On or about June 16, 2016, Kayleigh Moffett

---

[1] A simple Google search yield articles related to Gastelum's US drug conviction.
https://www.cleveland19.com/story/7488478/mexican-drug-ring-busted-2-million-in-cocaine-seized/

**Second Superseding Indictment – Page 10**

registered N569LM with the FAA. That same day, Ancheta, S.A. de C.V., a Mexican company, sold N569LM to ███. ████████████████████ signed on behalf of Ancheta. On or about June 16, 2016, ████████████ filed a Declaration of International Operations as president of ███. On or about January 3, 2020, the government learned that the aircraft is located in Mexico 90% of the time. ███ and its co-conspirators did not make any export filings for this aircraft. On or about January 15, 2020, Kayleigh Moffett filed a change of address for trustee ███.

33. **N515BA.** On or about June 25, 2020, ███ entered into a trust agreement with ██████████████. This document was certified as a true and correct copy by ███ noting ███. ███ then leased the aircraft back to ████████. ███ and its co-conspirators did not file export documents for this plane. On or about June 28, 2020, HSI learned of a suspicious flight leaving Mexican airspace in violation of a filed flight plan. The aircraft left Mexican airspace and entered Venezuelan airspace. Authorities located the flight and photographed the aircraft. It bore tail number N515BA. Authorities continued to monitor the aircraft and noticed that false tail number N5674 was later applied to the aircraft. N5674 is tied to a deregistered aircraft that differs substantially in appearance from the targeted aircraft. The Venezuelan military attempted to force the aircraft down but lost tracking near a clandestine runway. The following morning, a destroyed aircraft was located on the clandestine runway. Photos of the destroyed aircraft briefly appeared on a social media account and identified the aircraft as N515BA.

34.    **N770SW.** From approximately January 5, 2018 until April 16, 2019, N770SW was registered with the FAA as belonging to ███. On or about April 16, 2019, Kayleigh Moffett as secretary of ███ sent the FAA a bill of sale transferring the aircraft to Aircraft Finance Aircorp, Inc. The bill of sale was dated April 17, 2019. On or about June 17, 2019, ████████ told the government that Aircraft Finance Aircorp, Inc. was his company and that it had not purchased N770SW.  On or about June 18, 2019, a bill of sale transferred ownership of N700SW to ████████. This form is DocuSigned by ████████ as company secretary. On or about June 20, 2019, EOLO filed a Declaration of International Operations for N770SW to fly from Opa-Locka, Florida to Toluco, Mexico. EOLO asked the FAA to fax the flight wire to ████. EOLO Air Corp. is listed as the owner of the aircraft. A document on ████ letterhead asked the FAA to return all un-recordable documents to ███. ███ and its co-conspirators did not make any export filings for this aircraft.

35.    **N224EA.** On or about March 10, 2017, ███ purchased N224EA. The aircraft was registered with the FAA under ███. ████ is the sole owner and president of ██. That same day, █████ filed a Declaration of International Operations to fly the aircraft from Pompano, Florida to Cancun, Mexico. ███ and its co-conspirators did not make any export filings. On or about November 9, 2018, ███ sold N224EA to ████████. This company is wholly owned and operated by a relative of ██████. Despite ███'s representations that it owned the aircraft, other entities funded and operated the aircraft. On or about December 19, 2018, N224EA

crashed in Honduras while transporting drugs. On or about January 7, 2019, █████ █████ requested the deregistration of the aircraft for export to Mexico.

36. **N241CW.** On or about October 11, 2018, █████ purchased N241CW. That same day, █████ registered N241CW with the FAA under █████ and filed a Declaration of International Operations to fly the aircraft from Phoenix, Arizona to Ciudad Juarez, Mexico. █████ did not make any export filings. On or about December 9, 2018, N241CW crashed in Venezuela while delivering 1,200 kilograms of cocaine for the Sinaloa Cartel. On or about January 7, 2019, █████ submitted a deregistration request for export to Mexico.

37. **N322BC.** On or about January 11, 2019, █████ purchased N322BC and registered it with the FAA under █████. On or about January 14, 2019, █████ filed a Declaration of International Operation to fly the aircraft from McAllen, Texas to Monterrey, Mexico. On or about September 11, 2019, █████ submitted a deregistration request for export to Mexico. TWA and its co-conspirators did not make any export filings. On or about October 19, 2019, the aircraft landed on a clandestine airstrip in Cayo District, Belize, where it was found abandoned. The seats had been removed and the aircraft was configured for narcotics transportation.

38. **N35531.** On or about February 14, 2019, █████ purchased N35531, but never registered it. An unregistered aircraft should not be flown by anyone at any time. From approximately April 4, 2019 to November 13, 2019, the FAA sent letters to █████ notifying █████ that the aircraft was not registered. On or about February 15, 2019, a flight plan was filed for N35531. It disclosed a departure from Fort Worth, Texas to

Tampico, Mexico. On or about June 6, 2019, the aircraft was found abandoned in Guatemala. TWA did not make any export filings.

39.     **N465BC.** On or about August 16, 2019, TWA purchased N465BC and registered it with the FAA under ███. Despite ███'s representations that it owned the aircraft, other entities funded and operated the aircraft. On or about August 19, 2019, ███ filed a Declaration of International Operations to fly the aircraft from Memphis, Tennessee to Merida, Mexico. ███ and its co-conspirators did not make any export filings. On or about October 25, 2019, the aircraft landed on a clandestine airstrip in Guatemala. The aircraft was configured for narcotics transportation. That same day, ███ filed a request to deregister the aircraft for export to Mexico.

40.     **N530GA.** On or about March 2, 2018, ███ purchased N530GA and registered it with the FAA under ███. On or about June 6, 2018, ███ filed a Declaration of International Operations to fly the aircraft from Chino, California to Tijuana, Mexico. ███ and its co-conspirators did not make any export filings. On or about October 26, 2019, the aircraft landed on a clandestine airstrip in Guatemala. The aircraft was configured for narcotics transportation. As of December 11, 2020, N530GA was still registered to ███.

41.     **N939RR.** On or about January 11, 2017, ███ purchased N939RR and registered it with the FAA under ███████ is the sole owner and president of ███. Despite ███'s representations that it owned the aircraft, other entities funded and operated the aircraft. On or about May 29, 2018, ███████ deregistered the aircraft for export to Mexico. On or about December 16, 2019, the aircraft was seized in

Guatemala with approximately 2,572 kilograms of cocaine. ▮▮▮ did not make any export filings.

42.    **N990PA.** On or about May 9, 2018, ▮▮▮▮▮ purchased N990PA and registered it with the FAA under ▮▮▮. Despite ▮▮▮'s representations that it owned the aircraft, other entities funded and operated the aircraft. On or about March 22, 2019, the aircraft crashed in Honduras with one kilogram of cocaine and one firearm. On or about March 25, 2019, ▮▮▮▮ deregistered the aircraft with the acknowledgement that it was exported and destroyed. ▮▮▮ and its co-conspirators did not make any export filings.

43.    **N368AG.** On or about August 2, 2019, ▮▮▮▮▮ purchased N368AG and registered it with the FAA under ▮▮▮. ▮▮▮▮▮ entered into an Aircraft Security Agreement with ▮▮▮▮▮▮▮, a company located in Plano, Texas. ▮▮▮ ▮▮▮▮▮ entered into this agreement with ▮▮▮ on or about August 2, 2019. On or about August 2, 2019, ▮▮▮▮ filed a Declaration of International Operation to fly from Wichita, Kansas to Cancun, Mexico. ▮▮▮ and its co-conspirators did not make any export filings. On or about October 15, 2019, this aircraft was sold to ▮▮▮▮▮ ▮▮.

44.    **N2000.** On or about October 29, 2016, ▮▮▮▮ registered N2000 with the FAA through ▮▮▮▮▮ On or about October 31, 2016, ▮▮▮▮▮▮ ▮▮▮▮▮ sold N2000 to ▮▮▮▮▮. On or about November 1, 2016, ▮▮▮▮ filed a Declaration of International Operations for a flight from Nassau, Bahamas to Opa Locka, Florida. In approximately March 2017, ▮▮▮▮▮▮

attempted to use N2000 to conduct a narcotics delivery. On or about December 11, 2017, ████████████ through Ford Electronic Co. sold N2000 to ████████████████. The corresponding Bill of Sale was filed on or about January 10, 2018.

45.    **N466MM / NN886N.**  On or about November 25, 2015, ████████ ████████████ sold N466MM to ██████████. On or about December 25, 2015, ████████ ████ registered N466MM with the FAA. On or about October 30, 2018, ████████. sold N466MM to ████████. N466MM was a Hawker 700A. On or about November 30, 2018, a Hawker 700A attempted to land on a clandestine airstrip in Belize, but aborted its landing plans and landed in the Chetumal Airport in Mexico. This aircraft bore a modified registration number—NN886N. The pilot abandoned the aircraft.  The aircraft contained approximately 1,556 kilograms of cocaine. The aircraft also had two Honeywell TFE731 series engines with serial numbers P84284 and P76292. According to FAA documents, these serial numbers are assigned to N466MM, the aircraft registered to ████████ by ████████████ and leased to Mexican national ████████████████ ████. On or about December 14, 2018, ████ deregistered the aircraft noted that it was sold to a foreign purchaser and exported to Mexico while it was in the custody of the Mexican government. No export filing was made for this aircraft.

46.    **N884AB.** On or about August 10, 2020, ████████████████ sold N384AB to ██████████. On or about August 14, 2020, ████████████ filed a Declaration of International Operation for a flight to Monterrey, Mexico. On or about August 17, 2020, the registration number N384AB was changed to N884AB.  On or about August 25, 2020, ████████filed a Declaration of International Operation with the FAA for a flight

from Houston, Texas to Monterrey, Mexico. On or about August 26, 2020, ████

deregistered N884AB with the ███ and sold it to ████████████████

██, a Mexican company. An export filing listing ███████████ was made for this

aircraft. After August 26, 2020, it is illegal to display tail number N884AB on any

aircraft because it is a de-registered number. On or about August 29, 2020, the Mexican

government seized N884AB as a stateless aircraft. According to its pilots, the aircraft's

true owner is ████████████ in Guadalajara, Jalisco, Mexico. This individual

should have been listed on the export filing.



47.    **N740HB.** On or about June 10, 2019, N740HB was sold by ████████

████████████████ to ███████████, a Mexican citizen. On or

about May 24, 2020, an aircraft with fictitious registration number N740HBH arrived at

Hobby Airport in Houston, Texas from Durango, Mexico. This number was a clerical

error. The true registration number for this aircraft was N740HB. FAA registration

documents for N740HB list ███████—a company owned by ███████—

as the trustee owner and ████████████████ as the operator.

However, the Automated Passenger Information System filing for N740HB listed ████

███████ as the operator and ████████████, in Toluca Mexico as the owner.

████████████ is not listed on the FAA registration.  No export filing was made

for this aircraft.



48.    **N777EH.** On or about January 26, 2018, the FAA received a Bill of Sale

for N777EH noting that ███████ purchased N777EH from ███████████

███████ That same day, ███████████ filed an Aircraft Registration Application



for N777EH on the behalf of ███████. On or about February 27, 2018, the FAA received a bill of sale noting the sale of N777EH from ███████. to ███████ as Trustee. On or about January 26, 2020, Passengers waiting to board the N777EH were detained on the tarmac with approximately 168 kilograms of cocaine. The Aircraft was taken into Colombian custody. On or about January 27, 2020, ███████, as the Managing Member of ███████, sold N777EH to ███████. That same day ███████ deregistered the aircraft with the FAA for export to Mexico. These filings occurred while the aircraft was in Colombian custody. No export filings were made for this aircraft.

## THE TRUST SCHEME

49.     ███ typically enters into a (1) Trust Agreement, (2) Purchase Agreement and corresponding Bill of Sale, and (3) Dry Lease Agreement with a corporation owned by a foreign national. On at least one occasion, this foreign national was a convicted drug trafficker. Typically, the documents are structured as follows:

50.     **Trust Agreement.** The Trust Agreement creates a legal structure in which ███ holds the title to the aircraft for the benefit of the drug dealer's corporation. As explained earlier, the FAA requires this arrangement for a non-citizen to register his aircraft with the United States. ███ does not specifically identify any aircraft in its trust agreements by unique identifier. This runs contrary to the model trust agreement promulgated by the FAA in 2013.

| FAA Model | ███ Agreement |
|---|---|
| "Aircraft" means the Aircraft, serial number [], FAA Registration Number N [] together with the [] engines, bearings, manufacturer's serial numbers and [], which are transferred to the Owner Trustee in trust under this Trust Agreement | "Aircraft" means those certain airplanes or helicopters, including engines and parts, for which the Trustee holds title for the benefit of Beneficiary, and which shall constitute the Trust Property."<br><br>*Note, the Aircraft is not identified anywhere in ███ 's trust agreements.* |

The following provisions are noteworthy:

- *Section 2.4 Activities* — "The Trust may engage in the following activities: (i) the ownership, management, registration and leasing of the Trust property, (ii) activities which are necessary, suitable or convenient to accomplish the foregoing, and (iii) other such activities as may be required in connection with conserving the Trust Property and making distributions to the Beneficiaries."
- *Section 3.2. Limitations on Transfer* — allows the Beneficiary to transfer his beneficial interest in the trust but requires Trustee approval.
- *Section 4.3 Beneficiary's Duties to Provide Information under the FAA Trust Policy* — Beneficiary acknowledges that Trustee has reporting obligations to the FAA and agrees to provide information to fulfill those obligations.
- *Section 6.2 Specific Authority* — explains authorized activities of the Trustee including authorization to "take all actions which the Trustee deems necessary or advisable to register any Aircraft which comprises the Trust Property with the [FAA] and to insure that such Aircraft maintains its registration and complies with related regulations and requirements."
- *Section 6.4 (d)* — "nothing in this Agreement shall relieve any of the Beneficiary, Trustee or any other Person of any obligation to comply with any law, rule or regulation of any governmental authority with respect to the ownership and operation of the Aircraft."
- *Section 11.13 Beneficiary Compliance with US Law.* — The Beneficiary acknowledges that the aircraft may be subject to export and re-export restrictions and that these laws and OFAC regulations bind the Trustee.
- *Exhibit 1 Trustee Fee Schedule* — This form sets out payments owed to the Trustee for maintaining the trust. In the ███ trust agreements on file with the FAA, this form is blank.
- *Exhibit 2 FAA Trust Policy Certificate* — This is the form the Beneficiary fills out to aid the Trustee in meeting its FAA reporting obligations. In the ███ trust agreements on file with the FAA, this form is blank.

**Second Superseding Indictment – Page 19**

51.   **Bill of Sale.** ███ Trust Agreements create the trust, but do not transfer the aircraft from the foreign owner to the trustee. ███ executes an Aircraft Purchase Agreement and files a one-page Bill of Sale that appears to transfer the aircraft into ███s possession in exchange for a nominal amount, usually from $1 to $10.

52.   **Dry Lease Agreement.** After transferring the aircraft into the newly created trust, ███ leases the aircraft back to the foreign national through his corporation in a Dry Lease Agreement. A Dry Lease Agreement allows the Lessee to operate the aircraft and select his own crew. ███ also attempts to shirk its responsibilities by delegating regulation obligations to the foreign national. As explained above, the FAA publicly rejected this arrangement. The following are notable provisions:

- *Lease Agreement Section 3.1. Operation and Control* — "Lessee is responsible for operating the Aircraft in accordance and compliance with all laws, ordinances and regulations relating to the possession, use, operation, or maintenance of the Aircraft, including but not limited to, Federal Aviation Regulations."
- *Lease Agreement Section 3.4. Limits of Operations* — Lessee warrants it will not use the aircraft for an illegal purpose.
- *Lease Agreement Section 5.1 Lessor's Warranty* — Lessor warrants, among other things, that the aircraft is properly registered in the name of the Lessor in accordance with U.S. law.
- *Lease Agreement Section 6.13 FAA Trust Policy* — Lessee agrees to provide Lessor with the information needed to fulfill FAA reporting obligations.
- *Exhibit A* — Lessee provides name and contact information as well as the location where the aircraft will be primarily hangered. This location is usually foreign.
- *Exhibit B Addendum to Dry Lease Agreement Section 2. Compliance with US Law* — Lessee affirms it is in compliance with OFAC regulations and acknowledges that the aircraft may be subject to export restrictions.
- *Exhibit 1 to Exhibit B Addendum to Dry Lease Agreement FAA Trust Policy Certificate* — provides the address, contact information, and Jurisdiction of incorporation for the Lessee. This is usually a foreign corporation. It also

identifies the airport where the aircraft is "normally based" and the jurisdiction where the "aircraft is normally operated." These typically are foreign locations.

53.    After executing these agreements, the aircraft receives an "N" number. Now, it must adhere to all United States laws and regulations. The Trustee agrees to comply with to all of the reporting obligations for the aircraft. This streamlines the reporting process for the FAA by designating a U.S. citizen that is responsible for providing the FAA (and other agencies) with information related to the aircraft.

## THE SCHEME TO CONCEAL FUNDS

54.    █████ and its co-conspirators funnel money through refundable deposits placed on un-sellable aircraft during bogus sales transactions. The typical aircraft purchase transaction proceeds as follows:

- **Step 1:** The buyer identifies an aircraft he would like to purchase. There is usually a period of time during which the buyer will perform due diligence on the aircraft. In order to ensure the seller does not continue marketing the aircraft, the buyer will agree to provide a refundable deposit of money. The buyer and seller will agree to conditions that, if met, render the deposit non-refundable. Usually, the "hardening" of the deposit into a non-refundable deposit depends on whether the aircraft has passed an inspection initiated by the buyer.
- **Step 2:** The buyer typically secures a lender to help provide funds for the full-purchase price of the aircraft. The loan is for the purchase of the aircraft, not the deposit. If a buyer cannot afford the deposit, it signals to the seller that he is not capable of purchasing the aircraft.
- **Step 3:** The buyer and seller enter into an escrow agreement with an escrow agent. The escrow agent holds the buyer's refundable deposit in a separate account and controls disbursement of the funds. If there is a dispute between the buyer and seller about whether the deposit has become nonrefundable under the conditions of the parties' agreement, the escrow agent will decide the dispute and disburse the funds accordingly.

- **Step 4:** After completion of the sale, the buyer usually sells the aircraft to a company for a higher asking price. Sometimes the buyer will already have this second purchaser lined-up before he purchases the aircraft from the seller.

55.    The ███ scheme differs from this model in two key respects. *First*, the loan money is for the refundable deposit, not the purchase of the aircraft. *Second*, the sale of the aircraft is never consummated because the aircraft either does not exist or belongs to someone else. The ███ scheme is as follows:

- **Step 1:** The lender agrees to lend the fraudulent buyer a refundable deposit. The fraudulent buyer secured a loan, he now owes the lender interest.. The "hardening" of the deposit into a non-refundable deposit is contingent upon the illegitimate buyer's successful inspection of the aircraft and other things.
- **Step 2:** The deposit money is placed into an escrow company's escrow account, which is always designated by the fraudulent buyer, i.e. ███. Whereas a typical escrow agreement includes the buyer, seller, and escrow agent, this escrow agreement is usually between just the escrow agent and the fraudulent buyer.
- **Step 3:** The fraudulent buyer never inspects the aircraft because the aircraft either does not exist (e.g., has been decommissioned) or is not actually for sale (e.g., belongs to a commercial airline). ███ transfers the refundable deposit into accounts designated by the fraudulent buyer to be used for other purposes, and not for the purchase of the designated aircraft. ███ is compensated for these fraudulent transactions with money taken from the escrow account as well. As a result, the deal falls through and the deposit does not harden.
- **Step 4:** The fraudulent buyer then secures another loan from a lender for the purchase of another unsellable aircraft. This loan pays for the principle and interest owed for the previous unsellable aircraft transaction involving ███ and the fraudulent buyer.

56.    On or about September 27, 2019, ███ and ███ entered into a series of agreements for the sale of an unsellable plane. The plane was unsellable because it belonged to a private airline and was located in China. On or about September 27, 2019, a company known to the grand jury as "███" and ███ entered into a letter agreement

**Second Superseding Indictment – Page 22**

regarding a refundable deposit on an aircraft. ▇▇▇ signed this agreement on behalf of ▇▇ That same day, ▇▇▇ entered into an Escrow Agreement with ▇▇▇. ▇▇▇ signed this agreement on behalf of ▇▇▇.

57.     In or about December 2019, UC1 approached a legitimate bank known to the grand jury as "LB1" to secure a loan to perpetuate the scheme o.  On or about January 14, 2020, ▇▇▇ spoke with the CEO of LB1 over the phone about the proposed transaction. The proposed buyer in this transaction was ▇▇ and the proposed escrow company was ▇▇▇. UC1 engaged LB1 in a series of negotiations surrounding this proposal.  UC1 provided LB1 the serial number and registration of the aircraft. It did not correspond to any existing aircraft records. When asked about the discrepancy, UC1 responded that the information it originally provided was incorrect. UC1 provided a new registration number. This number corresponded to an aircraft that was decommissioned in 2017.

58.     On or about February 28, 2019, ▇▇ and ▇▇ entered into a series of agreements for the sale of an unsellable aircraft. The aircraft was unsellable because the aircraft has belonged to ▇▇▇▇▇▇▇. since 2010 and is registered in Japan.  On February 28, 2019, UC1 and SAI entered into a letter agreement regarding a refundable deposit on an aircraft. ▇▇▇ signed this agreement on behalf of SAI. That same day, UC1 and SAI entered into an escrow agreement with ▇▇▇. ▇▇▇ signed this agreement on behalf of SAI.

59.     On or about November 12, 2020, ▇▇, and ▇▇▇▇ entered into an agreement for the sale of an unsellable aircraft utilizing ▇▇. The aircraft was

unsellable because the aircraft belonged to Air India and was not for sale.  This agreement was for $5,000,000 refundable deposit on the unsellable aircraft.  ██████ signed this agreement on behalf of ███.  $550,000 was subsequently transferred to ██████ by ██████ for use other than the purchase of the aircraft.

## COUNT ONE

> Violation:  21 U.S.C. § 846 (Conspiracy to Manufacture and Distribute Cocaine)

That sometime in or about 2012, and continuously thereafter up to and including the date of this Second Superseding Indictment, in the Eastern District of Texas, and elsewhere, ██████████████ **Kayleigh Moffett,** ██████ ██████████ ██████████████████████████████████████████████ ██████████████████████████, defendants, did knowingly and intentionally combine, conspire, and agree with other persons known and unknown to the United States Grand Jury, to knowingly and intentionally possess with the intent to distribute five kilograms or more of a mixture and substance containing a detectable amount of cocaine, a schedule II controlled substance, a violation of 21 U.S.C. § 841(a)(1).

In violation of 21 U.S. § 846.

## COUNT TWO

Violation: 21 U.S.C. § 963 (Conspiracy to Manufacture and Distribute Cocaine Intending, Knowing, and with Reasonable Cause to Believe that the Cocaine will be Unlawfully Imported into the United States)

That sometime in or about 2012, and continuously thereafter up to and including the date of this Second Superseding Indictment, in Colombia, Ecuador, Panama, Costa Rica, Guatemala, Mexico, Belize, Venezuela, and elsewhere, ████████████ ████ **Kayleigh Moffett,** ██████████████████████████ █████████████████████████████████████████████████ ██████████████, defendants, did knowingly and intentionally combine, conspire, and agree with other persons known and unknown to the United States Grand Jury, to knowingly and intentionally manufacture and distribute five kilograms or more of a mixture and substance containing a detectable amount of cocaine, a schedule II controlled substance, intending, knowing, and having reasonable cause to believe that such substance would be unlawfully imported into the United States, in violation of 21 U.S.C. §§ 959(a) and 960.

In violation of 21 U.S.C. § 963.

## COUNT THREE

Violation: 21 U.S.C. § 959, 18 U.S.C. § 2 (Manufacturing and Distributing Five Kilograms or More of Cocaine Intending, Knowing and with Reasonable Cause to Believe that the Cocaine will be Unlawfully Imported into the United States)

That sometime in or about 2012, and continuously thereafter up to and including the date of this Second Superseding Indictment, in Colombia, Ecuador, Panama, Costa Rica, Guatemala, Mexico, Belize, Venezuela, and elsewhere, ███████████

███, **Kayleigh Moffett,** ████████████████████

████████████████████████████████████

████████████████, defendants, aided and abetted by each other, did knowingly and intentionally manufacture and distribute five kilograms or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance, intending, knowing, and with reasonable cause to believe that such cocaine would be unlawfully imported into the United States.

In violation of 21 U.S.C. § 959.

## COUNT FOUR

Violation: 18 U.S.C. § 1956(h) (Conspiracy to Commit Money Laundering)

From in or about 2016, and continuing thereafter up to and including the date of this Second Superseding Indictment, in the Eastern District of Texas, and elsewhere, ████████████████ **Kayleigh Moffett**████████████████

████████████████████████████, defendants, did

knowingly combine, conspire, and agree together and with others known and unknown to the Grand Jury, to commit offenses against the United States in violation of 18 U.S.C. §§ 1956 and 1957, that is:

(a)    to knowingly conduct and attempt to conduct financial transactions affecting interstate commerce and foreign commerce, which transactions involved the proceeds of specified unlawful activity, that is, wire fraud in violation of 18 U.S.C. §§ 1343, 1349; distribution or conspiracy to distribute or possess with the intent to distribute a controlled substance in violation of 21 U.S.C. § 846; and distribution or conspiracy to distribute or possess with the intent to distribute a controlled substance to a place in the United States from or through a place outside the United States in violation of 21 U.S.C. §§ 959 and 963, knowing that the transactions were designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, and that while conducting and attempting to conduct such financial transactions, knew that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, in violation of 18 U.S.C. § 1956(a)(1)(B)(i);

(b)    to knowingly conduct and attempt to conduct financial transactions affecting interstate commerce and foreign commerce, which transactions involved the proceeds of specified unlawful activity, that is, conspiracy to commit wire fraud in violation of 18 U.S.C. §§ 1343, 1349; distribution or conspiracy to distribute or possess with the intent to distribute a controlled substance in violation of 21 U.S.C. § 846; distribution or conspiracy to distribute or possess with the intent to distribute a controlled

substance to a place in the United States from or through a place outside the United States in violation of 21 U.S.C. §§ 959 and 963; and interstate and foreign transportation of stolen property in violation of 18 U.S.C. § 2314, knowing that the transactions were designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, and that while conducting and attempting to conduct such financial transactions, knew that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, in violation of 18 U.S.C. § 1956(a)(2)(B)(i); and

(c)     to knowingly engage and attempt to engage, in monetary transactions by, through, and to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000, and such property having been derived from a specified unlawful activity, that is, wire fraud; distribution or conspiracy to distribute or possess with the intent to distribute a controlled substance; and distribution or conspiracy to distribute or possess with the intent to distribute a controlled substance to a place in the United States from or through a place outside the United States, in violation of 18 U.S.C. § 1957.

In violation of 18 U.S.C. § 1956(h).

## COUNT FIVE

Violation: 18 U.S.C. § 371 (Conspiracy to
Commit Export Violations)

All prior allegations are re-alleged and incorporated by reference as though fully set forth herein.

## Introduction

The U.S. Department of Commerce, through the U.S. Census Bureau and the U.S. Department of Homeland Security, Customs and Border Protection, participates in and maintains the Automated Export System (AES), an electronic portal of information for exports of goods from the United States.  Both the Census Bureau and the Bureau of Industry and Security, also within the Department of Commerce, require the filing of electronic export information (EEI) through the AES (using AESDirect) pursuant to 13 C.F.R. Part 30 and 15 C.F.R. Part 758.  The EEI is also known as a shipper's export declaration (SED).  The purpose of these requirements is to strengthen the U.S. Government's ability to prevent the export of certain items to unauthorized destinations and end users because the AES aids in targeting, identifying, and, when necessary, confiscating suspicious or illegal shipments prior to exportation. 15 C.F.R. § 30.1(b). Exporters file EEI by entering data into AES via a computer. 15 C.F.R. § 30.6(a). EEI includes the date of export, the U.S. principle party of interest, the description of the commodity to be exported, the intermediate consignee's name and address (if applicable), the ultimate consignee's name and address, and the country of ultimate destination. 15 C.F.R. § 30.6. Each filing can be identified by a unique Internal Transaction Number. Exporters, shippers, and freight forwarders, with limited exceptions inapplicable here, are required to file an EEI for every export of goods or technology from the United States that has a value greater than $2,500 or for which an export license was required.  15 C.F.R. § 758.1(b)(5); 15 C.F.R. § 30.2.

## The Agreement

Sometime in or about 2014, and continuously thereafter up to and including the date of this Second Superseding Indictment, in the Eastern District of Texas, and elsewhere, the defendants ███████████ **Kayleigh Moffett,** ████████ ████████ did knowingly conspire with each other and with other persons, both known and unknown to the Grand Jury, to commit offenses against the United States, specifically:

(i)   Knowingly failing to file an EEI, in violation of 13 U.S.C. § 305; and
(ii) Fraudulently and knowingly attempting to export or send from the United States any merchandise, article, and object contrary to 13 U.S.C. § 305, a law and regulation of the United States, in violation of 18 U.S.C. § 554.

### Manner and Means

It was part of the conspiracy that ███████████ Kayleigh Moffett, and ████████████ would file or cause to be filed with the FAA documents that either concealed the true ownership of the aircraft, falsely identified the citizenship of the aircraft owner, or that established a trust. If the documents established the trust, the documents would contain misrepresentation and false assurances that the trustee would comply with United States regulations and laws as explained in more detail above in the section titled "The Trust Scheme." These aircraft were then shipped overseas without the requisite exportation filings under 15 C.F.R. §§ 30.3, 758.1. and 758.2.

### Overt Acts

In furtherance of the conspiracy and to accomplish its objects, at least one of the Defendants committed or cause to be committed, in the Eastern District of Texas and

**Second Superseding Indictment – Page 30**

elsewhere, the overt acts described in the section titled "Offending Aircraft Transactions" above.

In violation of 18 U.S.C. §§ 371 and 554, 13 U.S.C. § 305.

## COUNT SIX

> Violation: 18 U.S.C. § 371 (Conspiracy to Commit Registration Violations Involving Aircraft Not Providing Air Transportation in violation of 49 U.S.C. § 46306)

All prior allegations are re-alleged and incorporated by reference as though fully set forth herein.

That sometime in or about 2014, and continuously thereafter up to and including the date of this Second Superseding Indictment, ███████████████ **Kayleigh Moffett,** █████████████████████████████ defendants, did knowingly and intentionally combine, conspire, and agree with other persons known and unknown to the United States Grand Jury, to intentionally obtain and cause to be obtained a certificate authorized to be issued under Title 49, United States Code, Section 44103, that is, an owner's certificate of registration, by knowingly and willfully falsifying and concealing the following material facts with respect to the below aircraft:

| "N" Number | Material Misrepresentation |
|---|---|
| N8286M/N456F | Irvine A. Romero Lozano was the owner of the aircraft and was a United States citizen. |
| N260RC | That AGC would adhere to all regulatory and statutory requirements under United States law. |
| N18BA | That AGC would adhere to all regulatory and statutory requirements under United States law. |

| N305AG | That AGC would adhere to all regulatory and statutory requirements under United States law. |
| N311BD | That AGC would adhere to all regulatory and statutory requirements under United States law. |
| N35531 | ████ did not submit a registration filing and yet operated the aircraft in violation of United States law. |
| N515BA | That AGC would adhere to all regulatory and statutory requirements under United States law. |
| N770SW | The true owner of N770SW. |
| N224EA | The true owner of N224EA. |
| N465BC | The true owner of N465BC. |
| N939RR | The true owner of N939RR. |
| N990PA | The true owner of N990PA. |

## Objects of the Conspiracy

The objects of the conspiracy were: (1) to illegally enrich the conspirators by providing United States registration for aircraft that otherwise would not qualify for registration; (2) avoid compliance with United State regulatory and statutory requirements; and (3) to conceal the prohibited activities from the United States government as to avoid penalties, deregistration of the above listed aircraft, and disruption of the illegal activity.

## Manner and Means of the Conspiracy

It was part of the conspiracy and among the manner and means that some of the defendants, aided and abetted by each other and others: (1) either entered into a series of contracts that hid ownership, possessory, and citizenship information related to the aircraft; (2) to transmit this information or cause this information to be transmitted to the

FAA by wire in foreign or interstate commerce; and (3) to obscure the true end use of the aircraft and compliance with United States laws.

### Overt Acts

In furtherance of the conspiracy and to accomplish its objects, at least one of the Defendants committed or cause to be committed, in the Eastern District of Texas and elsewhere, the overt acts described in in the section titled "Offending Aircraft Transactions" above.

In violation of 18 U.S.C. § 371 and 49 U.S.C. § 46306.

### COUNT SEVEN

> Violation: 18 U.S.C. § 371 (Conspiracy to commit interstate and foreign transport of stolen property in violation of 18 U.S.C. § 2314)

All prior allegations are re-alleged and incorporated by reference as though fully set forth herein.  From in or about 2016, and continuing thereafter up to and including the date of this Second Superseding Indictment, in the Eastern District of Texas, and elsewhere, ▆▆▆▆▆▆▆▆▆▆ **Kayleigh Moffett**, ▆▆▆▆▆▆▆▆ did unlawfully transport, transmit, transfer, and cause to be transported, transmitted, and transferred in interstate and foreign commerce, moneys valuing $5,000 or more, knowing the same to have been stolen, converted and taken by fraud.

## Objects of the Conspiracy

The objects of the conspiracy were to illegally funnel investment money designated for aircraft purchases into foreign investments and to conceal from the investors that their investment funds were not being used to purchase aircraft.

## Manner and Means of the Conspiracy

It was part of the conspiracy and among the manner and means that some of the defendants, aided and abetted by each other and others engaged in the following:

- **Step 1:** The lender agrees to lend the fraudulent buyer a refundable deposit. The fraudulent buyer secured a loan, he now owes the lender interest. The "hardening" of the deposit into a non-refundable deposit is contingent upon the illegitimate buyer's successful inspection of the aircraft and other things.
- **Step 2:** The deposit money is placed into an escrow company's escrow account, which is always designated by the fraudulent buyer, i.e. WBAT. Whereas a typical escrow agreement includes the buyer, seller, and escrow agent, this escrow agreement is usually between just the escrow agent and the fraudulent buyer.
- **Step 3:** The fraudulent buyer never inspects the aircraft because the aircraft either does not exist (e.g., has been decommissioned) or is not actually for sale (e.g., belongs to a commercial airline). WBAT transfers the refundable deposit into accounts designated by the fraudulent buyer to be used for other purposes, and not for the purchase of the designated aircraft. WBAT is compensated for these fraudulent transactions with money taken from the escrow account as well. As a result, the deal falls through and the deposit does not harden.
- **Step 4:** The fraudulent buyer then secures another loan from a lender for the purchase of another unsellable aircraft. This loan pays for the principle and interest owed for the previous unsellable aircraft transaction involving WBAT and the fraudulent buyer.

## Overt Acts

In furtherance of the conspiracy and to accomplish its objects, at least one of the Defendants committed or cause to be committed, in the Eastern District of Texas and

**Second Superseding Indictment – Page 34**

elsewhere, the overt acts described in in the section titled "The Scheme to Conceal Funds."

In violation of 18 U.S.C. § 371 and 18 U.S.C. § 2314.


## NOTICE OF INTENT TO SEEK CRIMINAL FORFEITURE
18 U.S.C. §§ 981(a)(1)(C), 982(a)(1), and 982(a)(2); 21 U.S.C. §§ 853, 881(a), and 970; 28 U.S.C. § 2461; 49 U.S.C. § 46306(d); and 50 U.S.C. § 4819(d)

As a result of committing the offenses as alleged in this Second Superseding Indictment, defendants shall forfeit to the United States pursuant to 18 U.S.C. §§ 981(a)(1)(C), 982(a)(1), and 982(a)(2); 21 U.S.C. §§ 853, 881(a), and 970; 28 U.S.C. § 2461; and 49 U.S.C. § 46306(d) any property constituting, or derived from, proceeds obtained directly, or indirectly, as a result of the said violations, and any property used, or intended to be used in any manner or part, to commit or to facilitate the commission of the said violations, including but not limited to the following:

**Money Judgment**

A sum of money equal to $350,000,000 in United States currency, and all interest and proceeds traceable thereto, representing the amount of proceeds obtained by defendants as a result of the offenses alleged in this Second Superseding Indictment.

**Aircraft**

a. A Cessna T210K, Serial No. 21059286,  United States Registered Number N8286M

b. A Beech 200, Serial No. BB413, United States Registration number N456PF

c. A Lear 31A, Serial No. 080, United States Registered Number N260RC

d. A Gulfstream G-1159, Serial No. 236, United States Registered Number N311BD

e. A British Aerospace BAE 125-800A, Serial No. 258013, United States Registered Number N305AG

f. A Cessna 560, Serial No. 560-0068, United States Registered Number N569LM

g. A Gulfstream G-1159A, Serial No. 332, United States Registered Number N939RR

h. A Gulfstream G-IV, Serial No. 1087, United States Registered Number N368AG

i. A Hawker 800 XP, Serial No. 258740, United States Registered Number N740HB

**Substitute Assets**

If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendant:

a. cannot be located upon the exercise of due diligence;
b. has been transferred or sold to, or deposited with, a third person;
c. has been placed beyond the jurisdiction of the court;
d. has been substantially diminished in value; or
e. has been commingled with other property which cannot be divided without difficulty,

it is the intent of the United States, pursuant to 21 U.S.C. § 853(p), to seek forfeiture of any other property of defendants up to the value of the above forfeitable property, including but not limited to all property, both real and personal, owned by the defendants.

By virtue of the commission of the felony offenses charged in this First Superseding Indictment, any and all interest defendants have in the above-described property is vested in the United States and hereby forfeited to the United States pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461.

A TRUE BILL

_____

GRAND JURY FOREPERSON

STEPHEN J. COX
UNITED STATES ATTORNEY


_____

ERNEST GONZALEZ
COLLEEN BLOSS                              Date
Assistant United States Attorney

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION



UNITED STATES OF AMERICA

v.

KAYLEIGH MOFFETT (2)

§
§
§
§
§
§
§
§
§
§
§
§
§

**SEALED**

No.
Judge

## NOTICE OF PENALTY

### Count One

Violation:    21 U.S.C. § 846

Penalty:    If 5 kilograms or more of a mixture or substance containing a detectable amount of cocaine – not less than 10 years and not more than life imprisonment, a fine not to exceed $10 million, or both. A term of supervised release of at least five years

Special Assessment:  $100.00

### Count Two

Violation:    21 U.S.C. § 963

Penalty:    Violation:    21 U.S.C. § 963

Penalty:    Imprisonment for not less than ten years or more than life, a fine not to exceed $10,000,000.00 or both.  A term of supervised release of at least five years.

**Second Superseding Indictment – Page 38**

Special Assessment:  $100.00

## Count Three

Violation:    21 U.S.C. § 959

Penalty:    Imprisonment for not less than ten years or more than life, a fine not to exceed $10,000,000.00 or both.  A term of supervised release of at least five years

Special Assessment:  $100.00

## Count Four

Violation:    18 U.S.C. § 1956(h) and 1956(a)(2)(A) and (a)(2)(B)(i)

Penalty:    Not more than 20 years imprisonment; a fine not to exceed $250,000 or twice the pecuniary gain or loss. A term of supervised release of not more than 3 years.

Special Assessment:  $100.00

## Count Five

Violation:    18 U.S.C. § 371 (Conspiracy to Commit Export Violations)

Penalty:    Not more than 10 years imprisonment; a fine not to exceed $250,000 or both. A term of supervised release of not more than 3 years.

Special Assessment:  $100.00

## Count Six

Violation:    18 U.S.C. § 371 (Conspiracy to Commit Registration Violations Involving Aircraft, Not Providing Air Transportation in violation of 49 U.S.C. § 46306)

Penalty:    Not more than 5 years imprisonment to be served in addition to, and not concurrently with, any other term of imprisonment imposed on the

individual; a fine not to exceed $250,000, or both. A term of supervised release of not more than 3 years.

Special Assessment: $100.00

## **COUNT SEVEN**

Violation:      18 U.S.C. § 371 (Conspiracy to commit interstate and foreign transport of stolen property in violation of 18 U.S.C. § 2314)

Penalty:      Not more than 10 years imprisonment; a fine not to exceed $250,000 or both. A term of supervised release of not more than 3 years.

Special Assessment: $100.00